UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAN RICHMOND, | ) Case No.: 1:14-cv-00184 - JLT |
| Plaintiff, | ) ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | ) |
| MISSION BANK, | ) |
| Defendant. | ) |

Defendant Mission Bank seeks summary judgment on the claims brought by Plaintiff Jan Richmond, asserting the claims fail because Plaintiff voluntarily resigned from her position at Mission Bank, and there were legitimate business reasons for each change in her job duties. (Doc. 30.) Plaintiff opposes summary judgment, arguing the facts demonstrate Mission Bank wrongfully terminated her employment. (Doc. 35.)

Because there are genuine issues of material facts related to whether Plaintiff voluntarily resigned or was fired, Defendant's motion for summary judgment is **DENIED.**

I. **Procedural History**

Plaintiff, a former employee of Mission Bank, initiated this action by filing a complaint against Mission Bank on February 10, 2014. (Doc. 2.) Plaintiff alleged that after A.J. Antongiovanni became the bank president, she was removed from a private office and assigned a cubical "notwithstanding the fact private offices were empty and available, and Plaintiff engaged in activities that required privacy

1

and confidentiality." (*Id.* at 2.) In addition, Plaintiff alleged Antongiovanni hired an executive assistant in 2012 without announcing the job — despite Mission Bank's "policy of posting within the bank all open and available employment positions" — and the new assistant was "substantially younger than Plaintiff." (*Id.*) Plaintiff alleged the new assistant received a private office because "she handled confidential matters." (*Id.*)

In 2013, Plaintiff was the only vice president excluded from a management seminar. (Doc. 2 at 3.) Further, Plaintiff alleged that her job duties were reduced to "the point that she was ultimately only performing work relating to administrative functions for the board of directors." (*Id.*) However, Antongiovanni's new assistant "began performing administrative functions for the board of directors." (*Id.*) Plaintiff asserted it was "clear" that Antongiovanni and Mission Bank "were pushing Plaintiff out of the bank as an employee." (*Id.*) Plaintiff alleged that she "met with Antongiovanni and advised him [that] she realized what was happening, indicated she felt like she and others were victims of age discrimination, and requested that the bank offer her a severance package." (*Id.* at 3.)

Plaintiff filed claims with the California Department of Fair Employment and Housing and the EEOC, and received "right-to-sue" letters from both agencies. (Doc. 2 at 4.) Accordingly, she initiated the action now pending before the Court, asserting Defendant is liable for: (1) wrongful termination in violation of public policy; (2) wrongful termination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626; (3) wrongful termination in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940; (4) failure to take all reasonable steps to prevent discrimination and retaliation; and (5) retaliation in violation of FEHA. (*Id.* at 5-12.)

Mission Bank filed the motion for summary judgment now pending before the Court on January 30, 2015. (Doc. 30.) Plaintiff filed her opposition on February 24, 2015 (Doc. 35), to which Defendant filed a reply on March 3, 2015 (Doc. 37).

**II.    Legal Standards for Summary Judgment**

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III.     Undisputed Material Facts[1]

On July 2, 2007, Plaintiff began her employment with Mission Bank in a position entitled (JSF 1; UMF 1.) She was scheduled to work 32 hours per week as the Board Secretary and Executive Administrative Assistant to Richard Fanucchi, the President and Chief Executive Officer of Mission Bank, for which her annual salary started at $66,000. (*Id*.) Her job duties were classified as "administrative and customer service." (JSF 1.) Plaintiff was given a private office at Mission Bank's Downtown Branch in Bakersfield, California. (JSF 4.)

By 2011, Plaintiff "was referred to as Mission Bank's 'Human Resource Administrator,'" working under the direction of Fanucchi. (JSF 2, 6.) Her job duties as the Human Resource Administrator included "conducting employee orientations, completing new employee paperwork, performing pre-employment background investigations, preparing employment offer letters, submitting enrollment paperwork for benefits, cancelling employee benefits, informing payroll of deductions for benefits, maintaining employee personnel files, assigning and monitoring parking for employees, [and] processing miscellaneous employee requests including disability claims." (JSF 7.) In addition,

---

[1] The parties prepared a Joint Statement of Undisputed Material Facts ("JSF"). (Doc. 30-2). In addition, Plaintiff admits several of the facts in the Mission Bank's Separate Statement (Doc. 30-3), which are identified as undisputed material facts ("UMF").

Plaintiff "acted as liaison for benefits administrator 'Healthland,' reviewed various employee benefit bills and authorized payments, and participated in benefits selections and enrollment." (*Id.*)

In April 2011, Fanucchi stepped down from his role as President, but remained Chief Executive Officer of the bank. (JSF 3.) A.J. Antongiovanni was appointed as Fanucchi's successor. (*Id.*) The same month, Mission Bank's administrative offices relocated to a different building, where Plaintiff was assigned a cubicle space. (JSF 5.)

In 2011 and 2012, Plaintiff's responsibilities included serving as Fanucchi's executive assistant, serving as secretary to Mission Bank's Board of Directors, providing administrative assistance to Antongiovanni, and "human resources administrative work." (JSF 8.) In December 2012, Antongiovanni hired Diana Wolf to be the Operations Administrator of Mission Bank. (JSF 12.) Wolf's job duties included "organizational development" and working Antongiovanni's assistant. (*Id.*).

In February 2013, Antongiovanni asked Plaintiff "to prepare a list of her job duties." (JSF 18.) Plaintiff prepared the list, "highlighting any duties related to human resources." (JSF 19.) Antongiovanni and Plaintiff met to discuss her job duties in March or April of 2013. (JSF 20.) Plaintiff "alleges that there was one instance where Antongiovanni asked . . . if it was her 'plan to retire soon or in the near future.'" (JSF 21.)

Plaintiff received "a positive performance review by Fanucchi" on March 21, 2013. (JSF 22.) On the evaluation, Fanucchi indicated Plaintiff's position was "Administrative Officer," noting that Plaintiff's "primary responsibilities" were "administrative and . . . in support of the CEO." (Doc. 30-5 at 11.) However, Plaintiff also performed several functions for other senior officers. (*Id.*) Fanucchi explained:

> Jan's major responsibility has been preparing and disseminating material to the [B]oard of Directors including correspondence from the President and CEO as well as the monthly board packages. She does an excellent job of preparing the minutes of the Board, and all of the bank's committee meetings. She has also prepared, coordinated and documented several Board training sessions including tests on the various materials. . . .
>
> For the past several years Jan has been the bank's Human Resource Administrator and has done an excellent job developing procedures and maintaining consistency in dealing with the bank's employee personnel issues. She also maintains and monitors the banks [sic] health insurance log to assure that the billings and coverage are accurate.

(*Id.*) After this evaluation, Plaintiff was given a $10,000 bonus, and her "salary was increased to

$77,499.18 effective April 1, 2013." (JSF 23.)

On April 12, 2013, Antongiovanni gave Plaintiff a letter that indicated a reduction in the number of hours Plaintiff worked each week from 32 hours to 24 hours, and in a reduction in salary to $58,694. (JSF 26; Doc. 30-5 at 14.) In addition, the letter included "a list of [Plaintiff's] essential job duties effective July 1, 2013." (JSF 24.) The difference between the list prepared by Plaintiff in February and the list given to her by Antongiovanni was "the removal of any job duties relating to human resources administration." (JSF 25.)

On April 18, 2013, "Antongiovanni announced via email correspondence to Mission Bank employees that Wolf would now be handling all human resource functions at his direction." (JSF 28.) In addition, the announcement stated Plaintiff "would work directly for Antongiovanni and 'focus on board related activities.'" (*Id.*)

On July 1, 2013, Antongiovanni became the Chief Executive Officer of Mission Bank. (JSF 30.) Shortly thereafter, Plaintiff received another letter that indicated she was expected to work 32 hours per week, with a proposed annual salary of $77,499.12. (*Id.*) The list of Plaintiff's responsibilities mirrored the list given to Plaintiff in April 2013. (JSF 32.) Plaintiff never worked the reduced schedule previously proposed by Antongiovanni. (JSF 27.)

On August 28 or 29th, Plaintiff met with Antongiovanni after she learned that Wolf would be receiving a private office. (JSF 33-34.) During this conversation, Plaintiff requested a severance package from Mission Bank. (Richmond Depo. 32:3- 33:15.) Antongiovanni did not tell Plaintiff she was terminated during the meeting. (UMF 21.) He asked her to go home for the remainder of the day, and Plaintiff did not return until she met with Antongiovanni and a member of the Board of Directors on September 3, 2013, which was her next scheduled workday. (UMF 24-26.) At the meeting, Plaintiff learned her employment with Mission Bank would end on September 6, 2013. (Richmond Decl. ¶ 17; Antongiovanni Depo. 103:23-24.)

### IV.     Shifting burdens and the *McDonnell Douglas* framework

Plaintiff's claims under the Age Discrimination in Employment Act ("ADEA") and California's Fair Employment and Housing Act ("FEHA") involve the shifting of burdens articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Diaz v. Eagle*

*Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying the *McDonnell Douglas* framework to a discrimination claim under the ADEA); *Guz v. Bechtal Nat'l Inc.*, 24 Cal.4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes").

First, the plaintiff bears the burden to establish a prima facie case of a violation of the ADEA and FEHA. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). The evidence may be either direct or circumstantial, and the amount that must be produced to create a prima facie case is "very little." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas Corp*, 411 U.S. at 803. If the defendant carries this burden, the inquiry does not end. Rather, the burden shifts back to the plaintiff to demonstrate the reasons proffered by defendant are pretextual. *Id.*; *McDonnell Douglas Corp*, 411 U.S. at 805. Consequently, the plaintiff has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her]." *Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133, 142 (2000).

**V.     Discussion and Analysis**

   **A.     Plaintiff's claim for failure to prevent discrimination**

It is an unlawful employment practice under FEHA "for an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. Cal. Govt. Code § 12940(k). Defendant argues Plaintiff's claim fails "because she resigned when she first reported the alleged discrimination." (Doc. 30-1 at 20, emphasis omitted.) In addition, Defendant contends that "any of the actions that Richmond has complained of, individually or as a whole, do not constitute an adverse employment action that would have prevented Richmond from making a complaint about age discrimination." (Doc. 37 at 10.)

To succeed on a claim for failure to prevent discrimination, a plaintiff must establish "three essential elements: 1) plaintiff was subjected to discrimination, harassment or retaliation; 2) defendant

failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm." *Leleand v. City & County of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008) (citing Cal. Civil Jury Instruction 12.11). Thus, as Defendant observes, there can be no claim for failure to prevent discrimination without first establishing an underlying claim for discrimination. *Trujillo v. North Co. Transit Dist.*, 63 Cal.App.4th 280, 286 (1998).

FEHA prohibits employers from discriminating against employees on the basis of age. Cal. Gov't Code § 12940(a). An individual may demonstrate discrimination by showing disparate treatment, disparate impact, or the existence of a hostile work environment. *See DeJung v. Superior Court,* 169 Cal. App. 4th 533, 549 n. 10 (2008); *Lyle v. Warner Bros. Television Production*, 38 Cal.4th 264, 279, 132 P.3d 211 (2006); *Guz*, 24 Cal.4th at 354, n. 20. A plaintiff establishes a prima facie case of age discrimination by providing evidence that: "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Guz*, 24 Cal.4th at 355.

It is not disputed that Plaintiff is a member of the protected age class, or that Plaintiff was performing her work in a satisfactory manner. (*See* JSF 22.) Further, Plaintiff's job responsibilities were changed by Mission Bank, which took away any "job duties relating to human resources administration." (JSF 25.) The removal of job duties affected the "terms and conditions" of her employment and—taking the facts in the light most favorable to Plaintiff—could be viewed as a demotion.[2] As such, Plaintiff has met her burden of identifying an adverse employment action.[3]

---

[2] The parties disagree whether Wolf took on Plaintiff's job responsibilities related to the Board of Directors. According to Plaintiff, she attempted to discuss an issue with a director, only to be informed that "Wolf had already contacted him about an issue." (Doc. 35-19 at 6, Richmond Decl. ¶ 12.) Further, Wolf began making arrangements for the board related to an out of town meeting. (*Id.*, ¶ 13.) On the other hand, Antongiovanni testified that he asked Wolf to contact the director because Plaintiff was not at work. (Antongiovanni Depo. 80:3-9.) He did not explain why Wolf was making arrangements for the board meetings.

[3] In addition, and without deciding, the fact that Plaintiff's hours were cut and her salary reduced—even though these changes never took place—may be evidence of an adverse employment action. *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ["[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful"] citing on *Delaware State College v. Ricks*, 449 U.S. 250 (1980); *Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1341 (11th Cir. 1999) ("Maxwell violated the ADEA when it decided to either demote or discharge

Finally, Plaintiff presents evidence that her replacement, whether Diana Wolf or Joanne Erasserat, was substantially younger than Plaintiff. (*See* Doc. 35 at 28, citing *Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir.1981)). This satisfies the requirement that Plaintiff identify circumstances suggesting a discriminatory motive. *Guz*, 24 Cal.4th at 355. Thus, the Court finds Plaintiff stated a prima facie case for age discrimination.

Significantly, Defendant premised its motion for summary adjudication of this claim upon the argument that Plaintiff "was not subjected to discrimination, harassment or retaliation while employed by Mission Bank." (Doc. 30-1 at 21.) Having chosen to rest on the proposition that Plaintiff voluntarily left her position, Defendant fails to provide evidence outlining the steps it took to prevent discrimination. Consequently, Defendant's motion for summary adjudication of Plaintiff's fourth cause of action for "failure to prevent" discrimination in violation of FEHA is **DENIED**.

### B. Plaintiff's wrongful termination claims

Under ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). This prohibition is "limited to individuals who are at least 40 years of age." *Id.* § 631(a). Similarly, FEHA imposes liability on an employer for discharging an employee over 40 years of age because of that person's age. Cal. Gov't Code §§ 12926(b), 12940(a).

A plaintiff establishes a prima facie case of wrongful termination on the basis of age in violation of the ADEA and FEHA by showing she was "(1) at least forty years old[4], (2) performing [her] job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (citation omitted); *see also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 704 (9th Cir. 1993) (noting that California courts have adopted the analysis of the ADEA for age discrimination claims arising under FEHA). Notably, the proof necessary for a plaintiff to establish a

---

Nance on the basis of her age. [Footnote] The fact that Maxwell later changed its mind did not remedy the violation. Maxwell's argument that no adverse employment action occurred therefore fails.")

[4] It is not disputed that Plaintiff was over forty years old and was performing her job in a satisfactory manner. (See JSF 22.)

9

prima facie case under both the ADEA and FEHA "is minimal and does not even need to rise to the level of a preponderance of the evidence."[5] *Coghlan*, 413 F.3d at 1094; *see also Avila v. Continental Airlines*, 165 Cal. App. 4th 1237, 1246 (2008).

1. There is substantial disagreement whether Plaintiff was fired

Defendant argues Plaintiff's "wrongful termination claims all fail because she cannot show she was terminated." (Doc. 30-1 at 12.) Defendant asserts the evidence shows that Plaintiff "voluntarily resigned" and she "was not constructively discharged from her employment" with Mission Bank. (*Id.* at 12-13.)

Notably, the parties agree that after the meeting between Plaintiff and Antongiovanni, Plaintiff was not asked to surrender her keys or other indicia of employment. (Doc. 35-19 at 7, Richmond Decl. ¶ 16) The agree Antongiovanni told her to go home at some point after their discussion ended. They agree further that on September 3, 2013, Defendant presented the separation agreement to Plaintiff at the beginning of the meeting—which detailed that her official separation date would be September 6, 2013—and they agree she presented her counteroffer/resignation document afterward. Finally, they agree that she was given her last paycheck and a check for her outstanding vacation pay at the September 3 meeting. (Richmond Decl. ¶ 17; Antongiovanni Depo. 103:23-24.)

However, the parties have significant disagreement as to other circumstances related to the separation of Plaintiff from her employment at Mission Bank. According to Antongiovanni, Plaintiff came to his office and "resigned." (Antongiovanni Depo. 88:17-25.) At his deposition, Antongiovanni was asked about the conversation and testified as follows:

> Q. Why do you say she resigned?
> A. She resigned.
> Q. Okay. Did she do this verbally?
> A. Yes.

---

[5] To prevail on a claim of age discrimination in violation of the ADEA at trial, a plaintiff faces a higher burden and must establish that her age was the "but-for" cause of the employer's adverse action. *Gross v. FBL Financial Servs.*, 557 U.S. 167, 176 (2009). The Supreme Court found, "[T]he ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.*, 557 U.S. at 167-68. However, the Ninth Circuit determined the *Gross* standard applies only at trial, and not at the summary judgment stage. *Shelley v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012).

1   Q. Where?

2   A. In my office.

3   Q. Who else was present?

4   A. No one.

5   Q. What did she specifically say?

6   A. "I quit."

7   Q. Anything else that she said to you?

8   A. I asked her, "Come to my office." I opened my door -- my door was open -- let her through the doorway. I turned to close the door, and before the door was shut, she said, "I quit." And I don't remember specifically all the details of what she said subsequent to that, but we did discuss her resignation. We sat down. Jan had told me she quit a few months earlier, and then had changed her mind. So with that background, I -- I asked her if she was really sure if she's quitting. I asked her to, maybe, just think about it, take some time, and we'll talk about it later, make sure this is the decision that she wanted. And she reiterated, "No. I quit." So that's it.

(Antongiovanni Depo. 87:20- 88:20.) This testimony is corroborated by Mr. Fanucchi, who testified that Plaintiff called him and said that "she had resigned her position at Mission Bank." (Doc. 30-6 at 98, Fanucchi Depo. 68:15-16.) Therefore, Defendant maintains that Plaintiff chose to resign during the conversation with Antongiovanni.

On the other hand, Plaintiff testified that she did *not* quit her job during the discussion with Antongiovanni. According to Plaintiff, Antongiovanni requested to speak with her. (Richmond Depo. 31:24- 32:1.) She testified that during the conversation:

A. I informed A.J. that the writing was on the wall and that I was victim of age discrimination, and not only me, but other employees continued to be discriminated against for age, and that I did not trust him or respect him for the way he treated myself and other senior employees, and let's just get on the read and why don't you just present me with a package.

Q. Didn't you tell him that you quit?

A. Absolutely not.

Q. What did you mean by saying let's just get on the road and give me a package?

A. The writing was on the wall. In my opinion, that -- that was his intention, to work me out of the bank.

Q. And that's what you told him?

11

```
1         A.  Yes.
2         Q.  And you told him, then, to just put together a package; is that right?
3         A.  Right.
4         Q.  And what was his response?
5         A.  He agreed that he would get back with me.  We had a short conversation
              about how -- why I thought other employees were mistreated.  Then he stated that
6             he would work on a package, so I went back to my desk, continued with what I
              was working on.  He then came over and told me to go home.
7         * * *
8         Q.  So it's your testimony that you did not tell him that you quit?
9         A.  Correct.
```

(Richmond Depo. 32:3- 33:15.)  Richmond does not specifically address the deposition testimony of Mr. Fanucchi but she does state, "At no time did I ever tell anyone on that day that I quit my job or that I resigned from my job." (Doc. 35-19 at 7, Richmond Decl. ¶ 15.)  Further, Plaintiff claims she returned to her desk and continued working after the meeting.  (*Id*.)  The Bank asserts, instead, that Antongiovanni told her to leave for the day at the meeting and, impliedly, disagrees she returned to her desk to work.

According to Plaintiff, she went to the meeting on September 3 with the written counteroffer/ resignation letter because she had been advised by someone to have one prepared.  (Doc. 35-19 at 7, Richmond Decl. ¶ 17.)  Plaintiff contends that her purpose in presenting the letter, after Defendant terminated her via the severance package, was to make it appear it was "mutually agreed upon versus a termination so that for future employment it wouldn't hurt me." (Doc. 30-4 at 108.)  She denies that the preparation or presentation of this letter demonstrates that she had or would quit because she claims that she would not have presented it had she not already been fired in the severance documents.  Defendant argues that this letter—especially the language used in it—demonstrates and corroborates that Plaintiff quit when discussing the matter with Antongiovanni.

For purposes of this motion, the Court must accept Plaintiff's version and explanation of the events—that she did not believe her employment with Mission Bank was over after the meeting with Antongiovanni. The Court is unable to make a credibility determination to resolve the conflict.

*Soremekum v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Anderson*, 477 U.S. at 225 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment").  Even if the Court was convinced, though it does not so find, that the weight of the evidence is in Defendant's favor, this is not a proper consideration for the Court on a motion for summary judgment.  Indeed, in *Anderson*, and in *Soremekum* and, the courts specifically prohibited this. *Anderson*, 477 U.S. at 225 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment"); *Soremekum*, 509 F.3d at 984 . ("the Court does not make credibility determinations or weigh conflicting evidence" when evaluating a motion for summary judgment).   Rather, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255; *see also Orr*, 258 F.3d at 772.  In *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 968 (9th Cir. 1981), the Court held,

> Although Pioneer may have presented the greater weight of the evidence, it is not the function of the trial judge to weigh the evidence when the case is only at a preliminary state of a motion for summary judgment. Such decisions are best left to the jury. As the Supreme Court said in Sartor, "the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try."

*quoting Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628 (1944).  Thus, the statements from Plaintiff that she did not quit her job with Mission Bank must be accepted and the Court is precluded from making a determination of this motion based upon the weight of the evidence.

### 1. Replaced by a substantially younger employee

Defendant does not squarely address this issue as an element of the wrongful discharge claim except as it relates to whether Plaintiff was constructively discharged.  However, the Court accepts those arguments as applying to the third element of the prima facie case.

Defendant does not dispute that Wolf is 31 years younger than Plaintiff. (Doc. 35 at 28) While Defendant agrees that "some of Richmond's duties were transferred to Wolf," it denies Plaintiff was replaced by Wolf.  (Doc. 30-1)  Instead, Defendant asserts that Plaintiff was replaced by JoAnna

Erassarret.[6] (UMF 29)

However, indisputably, Wolf took over the duties as the CEO's assistant and those related to human resources to which Plaintiff had been previously assigned. (JSF 8, 12, 25) Likewise, Plaintiff presents evidence set forth in footnote 2 above, that Wolf was assigned duties related to the Board of Directors as well. Thus, the Court finds Defendant has not met its burden of establishing that there is no dispute of material fact whether Plaintiff was replaced by a substantially younger employee.

2. Conclusion

Because there is a genuine issue of material fact (*Celotex,* 477 U.S. at 323), Defendant's motion for summary judgment on Plaintiff's claims of wrongful termination in violation of FEHA and the ADEA are **DENIED**.

Notably, Plaintiff's claim of wrongful termination in violation of public policy is derivative of her statutory claims under FEHA. *See Nielsen v. Trofoholz Technologies, Inc.*, 750 F.Supp. 2d. 1157, 1171 (E.D. Cal. 2010) (citing *Jennings v. Marralle*, 8 Cal. 4th 121, 135-36 (1994)), *aff'd* 470 Fed. App'x 647 (9th Cir. 2012). Therefore, Defendant's motion for summary adjudication of the claim for wrongful termination in violation of public policy is also **DENIED**.

**C. Plaintiff's retaliation claim**

Plaintiff alleges Defendant is liable for retaliation in violation of FEHA, under which it is unlawful "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). An employer violates the anti-retaliation provision if an "adverse employment action occurs because of the employee's opposition to conduct made unlawful." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997). To establish a prima facie case for retaliation in violation of FEHA, a plaintiff must demonstrate "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th

---

[6] Defendant admits that Ms. Erassarret was 47 years old when she was hired which, of course, was 13 years younger than Plaintiff.

1028, 1042 (2005).

### 1. Plaintiff's Prima Facie Case

Mission Bank does not assert that Plaintiff did not engage in a protected activity when she complained about being the victim of age discrimination. However, Mission Bank argues Plaintiff is unable to establish a prima facie case for retaliation in violation of FEHA because she "cannot show any adverse employment action nor can she show the adverse action occurred after the protected activity." (Doc. 30-1 at 21.)

#### a. Adverse employment action

"[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and citation omitted). The Ninth Circuit has determined "a wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray*, 217 F.3d at 1240. Adverse employment actions may include a transfer of job duties, undeserved performance ratings, and the dissemination of unfavorable job references. *Id.* at 1241 (citing *Yartzoff*, 809 F.2d at 1376; *St. John v. Employment Development Dept.*, 642 F.2d 273, 274 (9th Cir. 1981); *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997)). Even a lateral transfer may constitute an adverse employment action. *See Yartzoff*, 809 F.2d at 1376. To determine "whether a particular action or course of conduct rises to the level of actionable conduct, the court "should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052 (2005).

Here, as discussed above, there is a question of fact whether Plaintiff was terminated. Viewing the evidence, and all reasonable inferences therefrom, in the light most favorable to Plaintiff, she has shown she was terminated from her employment with Mission Bank. As such, Plaintiff suffered an adverse employment action. *See Guz*, 24 Cal.4th at 355 (termination is an adverse employment action).

#### b. Causation

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory

employment decision." *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987). "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Id.* at 1376; *see also Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity").

In this case, Plaintiff reported feeling that she and others were suffering age discrimination, and her employment with Mission Bank was ended less than one week later. Because the termination is "on the heels of [Plaintiff's] protected activity," a causal link may be inferred. *See Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002); *see also Yarztzoff*, 809 F.2d at 1376 (inferring causation where adverse employment actions took place less than three months after the plaintiff's complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint).

### 2. Legitimate Reason

Once Plaintiff has established a prima facie case for retaliation, the burden of production shifts to Mission Bank "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155. Under FEHA, a defendant must identify "reasons that are facially unrelated to prohibited bias," but the articulated reasons "need not necessarily have been wise or correct." *Guz*, 24 Cal.4th at 358.

At the hearing, counsel for Defendant argued that if the Court found that Plaintiff was fired, it had to consider Defendant's legitimate business reason for doing so. The proffered reason was that Plaintiff "asked for it." Notably, in neither its moving nor reply papers did Defendant set forth any argument that a legitimate business reason motivated its action in terminating Plaintiff. Rather, Defendant rested on its argument that Plaintiff quit her job.

In any event, California courts have accepted—at least in the unemployment insurance appeals context—a theory of "constructive voluntary quit" in which the employee acts in such a way as to force

the employer to fire her. *See Kelley v. California Unemployment Ins. Appeals Bd.*, 223 Cal.App.4th 1067, 1079 (2014). However, as noted, Defendant did not argue this theory at the hearing or in its pleadings nor did it argue that it had no choice but to fire Plaintiff; it argued, at most, its acquiescence in her request to separate from the employment. Thus, based upon the evidence and arguments that were submitted, the Court cannot find as a legitimate business reason for Plaintiff's termination that she *voluntarily* agreed to an *involuntary* separation from employment.

Because there is a question of fact regarding whether Plaintiff was terminated by the bank, and because Defendant fails to meet its burden to identify a legitimate business reason for such a termination, the motion for summary adjudication of Plaintiff's retaliation claim is **DENIED**.

## VI.     Conclusion and Order

Given the conflicting evidence presented by Mission Bank and Plaintiff the terms and conditions of her employment, as well as her separation from Mission Bank, Defendant has not carried its burden to show an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. A jury must make credibility determinations and resolve the conflicts between the evidence. *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.

Accordingly, it is **HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 30) is **DENIED.**

IT IS SO ORDERED.

Dated:   **March 13, 2015**                        **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE